IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY THOMAS,                          :
                                         :
        Plaintiff                        :
                                         :        CIVIL NO. 1:CV-10-2437
    vs.                                  :
                                         :        (Judge Caldwell)
RAYMOND LAWLER,                          :
SUPERINTENDENT, *et al.*,                :
                                         :
        Defendants                       :


*M E M O R A N D U M*

I.    *Introduction*

            The pro se plaintiff, Gregory Thomas, an inmate at the Huntingdon State

Correctional Institution (SCI-Huntingdon), Huntingdon, Pennsylvania, filed this civil-rights

action.  Thomas names the following defendants: Raymond Lawler, formerly SCI-

Huntingdon's superintendent; the prison's Program Director Keller; and the prison's

Activity Specialist Frailey.  Plaintiff, a Muslim, alleges defendants Lawler and Keller

violated his rights under the Religious Land Use and Institutionalized Persons Act

(RLUIPA) of 2000, 42 U.S.C. §§ 2000cc *et seq.*, and the First Amendment's Free

Exercise Clause by not providing him a communal setting for the practice of his religion

unadorned by religious icons of other faiths.  He also asserts a claim under the

Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. §§ 12101 *et seq.*, against these

defendants for not providing him a more accessible location for his participation in Muslim

Jumu'ah services, given his physical limitations.  Finally, Thomas presents a First

Amendment retaliation claim against all three defendants for his removal as Vice President of SCI-Huntingdon's chapter of the Pennsylvania Lifers' Association after letters he sent to the Executive Director of the Pennsylvania Commission on Sentencing were reviewed by prison staff.  (Doc. 149, 2d Am. Compl.)  Thomas seeks compensatory and punitive damages as well as injunctive relief.  (*Id.*)

Presently before the court is Defendants' motion for summary judgment. For the reasons discussed below, summary judgment will be granted as to Thomas's First Amendment and RLUIPA claims.  As Defendants did not seek summary judgment on Thomas's ADA claim against Lawler and Keller, that claim will be set for trial in due course.

II.    *Standard of Review*

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is material if it might affect the outcome of the suit under governing law."  *Lupyan v. Corinthian Colls. Inc.,* 761 F.3d 314, 317 (3d Cir. 2014)(citing *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011)).  We "must view all evidence and draw all inferences in the light most favorable to the non-moving party," and we will only grant the motion if "no reasonable juror could find for the non-movant."  *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

The initial burden is on the party seeking summary judgment to identify evidence that demonstrates an absence of a genuine issue of material fact. *Budhun v. Reading Hosp. and Medical Cntr.*, 765 F.3d 245, 251 (3d Cir. 2014)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant must support his position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by showing that the nonmoving party "failed to make a sufficient showing to establish the existence of an element essential" to that party's case. *Celotex*, 477 U.S. at 322, 106. S.Ct. at 2552.

After the moving party has met its initial burden, "[t]he non-moving party cannot rest on mere pleadings or allegations," *Ell v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231 - 32 (3d Cir. 2001). The nonmoving party must "go beyond the pleadings" and either by affidavits, deposition, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The nonmoving party "must support the assertion" that a fact is genuinely in dispute by: "(A) citing to particular parts of materials in the record . . .; or (B) showing that

the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). The court is not tasked to dig through the record to find facts supportive of either party's summary judgment position.

The Middle District of Pennsylvania's Local Rules require a party seeking summary judgment to file "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." Likewise, those opposing a motion for summary judgment

> shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement [filed by the moving party], as to which it is contended that there exists a genuine issue to be tried. Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

Pa. M.D. Local R. 56.1; *see also* Fed. R. Civ. P. 56(e)(2) (if a party fails to properly support an assertion of fact, or address an another party's assertion of fact, the court may consider the fact undisputed for the purpose of the motion).

In ruling on a motion for summary judgment, the court must use the same evidentiary standard that would apply at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive

-4-

evidentiary standard of proof that would apply at the trial on the merits"); *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 129 (3d Cir. 2005).

A "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Inadmissible hearsay should not be considered during summary judgment. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009). An "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The declaration must contain facts demonstrating a basis for the affiant's claim that his statements are based on his personal knowledge. *See Maldonado v. Ramirez*, 757 F.2d 48, 50-51 (3d Cir. 1985)("The affidavit must be made 'on personal knowledge,' must set forth 'such facts as would be admissible in evidence' and must 'show affirmatively that the affiant is competent to testify to the matters stated therein.'"). Declarations that are conclusory and lacking in specific fact have no probative value. *Id.* at 51.

III.     *Statement of Undisputed Facts*

Except where expressly noted, the following are undisputed material facts supported by admissible evidence in the record, and are viewed in the light most favorable to the non-moving party, Thomas.[1]

---

[1]  Although Thomas filed a response to Defendants' statement of material and undisputed facts, it does not comply with the requirements of Pa. M.D. Local Rule 56.1. (Doc. 186). While
(continued...)

-5-

A.    *Islamic Practice at SCI-Huntingdon*

The Pennsylvania Department of Corrections (DOC) is committed to providing inmates with the opportunity to practice the basic tenets of their faith through religious programs and services, while guarding against the misuse of inmates claiming religious beliefs as a means of obtaining special privileges or breaching security. (Doc. 178, Defs.' Statement of Material and Undisputed Facts (DSMF), ¶ 1). The DOC allows for diversity of worship, and reasonable accommodations are made for inmates consistent with the order, safety and security of the correctional facility, prison staff and inmates. (DSMF ¶ 2). Each prison provides ecumenical services for major faith groups (Catholics, Jehovah's Witnesses, Jewish, Muslims, Native Americans and Protestants), which represent the whole body of a particular faith group unless there is a temporary vacancy. (DSMF ¶¶ 4-5). In order to allow for diversity of worship and accommodation, reasonable accommodation and some degree of tolerance and respect by each faith group is warranted. (DSMF ¶ 3). Religious leaders are approved by the DOC in order to assure that worship is appropriate in accordance with the tenets of the faith groups and to

_____

[1](...continued)
Thomas "denies" most of the facts set forth in Defendants' statement of undisputed facts (Doc. 178), he does not cite to evidence in the record to demonstrate that the facts are genuinely disputed. Thomas also generally attacks the declarations of DOC staff members offered in support of Defendants' statement of facts as "inadmissible" without further explanation. (Doc. 186). Finally, Thomas submits over 230 pages of exhibits in support of his opposition brief. None of the documents are referenced in his statement in opposition to Defendants' statement of facts. (Doc. 187). As such, the facts set forth by Defendants will be admitted unless properly controverted by Plaintiff's evidentiary materials. *See* M.D. Pa. Local Rule 56.1 and Fed. R. Civ. P. 56 (c)(3).

guard against potential security concerns. (DSMF ¶ 6). The DOC policy for religious activities is set forth in DOC Administrative Directive 819 (DC-ADM 819).

Per DC-ADM 819, general population inmates are permitted to attend communal religious services and programs which take place in the multi-faith chapels or elsewhere in the institutions. (DSMF ¶ 8). For Muslim services, these include weekly Jumu'ah service, Talim (religious instruction), and often basic learning of Arabic. (DSMF ¶ 9 and ¶ 43). Additionally, dependant on an inmate's custody level/housing status, inmates are permitted to purchase and maintain various sacred objects in their cells. (DSMF ¶ 10). Muslim inmates are permitted to possess an Allah pendant, a prayer rug, a set of Zikr beads, and two kufis in addition to a sacred text, religious magazines, devotional guides, and other religious books and pamphlets. (DSMF ¶¶ 11-12). Inmates may pray and perform religious rituals and/or devotional practices individually in their cells. (DSMF ¶ 13). Inmates, regardless of their housing status, are permitted to designate a Religious Advisor, with whom they are permitted to correspond, as well as contact religious leaders within the community. (DSMF ¶¶ 14-15). All inmates may receive visits from their designated Religious Advisor, in accordance with the DOC's visitation policy, DC-ADM 812. (DSMF ¶ 16). Such visits are generally no less than an hour long, sacred texts are available during these visits. (DSMF ¶ 17). One-on-one religious counseling with a chaplain of their choosing is also available. (DSMF ¶ 18).

Muslim inmates are afforded the opportunity to participate in the annual Ramadan fast. (DSMF ¶ 19). The DOC accommodates this thirty-day daylight-hour fast

by providing an evening meal after sunset and a breakfast meal before dawn. (DSMF ¶ 20). All Muslim inmates are served two Eid ceremonial meals each year. (DSMF ¶ 21). One is at the conclusion of Ramadan called Eid al-Fitr, and the other is provided about two months later, called Eid al-Adha. (DSMF ¶ 22). General population inmates, and those in administrative and disciplinary custody may order a limited number of Optional Menu Items to complement the food items provided by the DOC for the two ceremonial meals. (DSMF ¶ 23). Finally, Muslim inmates who feel it is a religious obligation to grow a beard longer than three inches in length may do so by requesting a Grooming Length Exemption, and Muslim inmates who wish to maintain a Halal Diet may request, via the Religious Accommodation process, a No Animal Products Diet. (DSMF ¶ 24).

B.     *The Location of SCI-Huntingdon's Multi-Faith Chapel*

SCI-Huntingdon, including its multi-faith chapel, was constructed 125 years ago. (DSMF ¶ 25). The multi-faith chapel is centrally located within the prison on the third floor. (DSMF ¶ 26). Individuals must climb four flights of stairs to access the multi-faith chapel. (DSMF ¶ 27).

Due to SCI-Huntingdon's physical plant and financial constraints, it would be impractical to move the multi-faith chapel to a different location. (DSMF ¶ 28). There is no other suitable space at SCI-Huntingdon that is large enough to accommodate the number of inmates who use the chapel. (DSMF ¶ 29). Islamic religious feast are served

in the gymnasium. (Doc. 179-10, Erdogan Decl., ¶¶ 23-24 and Doc. 186, Pl.'s Response to Defs.' Statement of Undisputed Facts (PSMF), ¶ 29).

Thomas, who wears adult depends at night and a urine-condom leg bag due to spinal issues (Doc. 179-4, ECF p. 4), stated "it's hard to get up there at times" because of his ambulatory difficulties. "Sometimes it flares up, I can't make it . . . even go when I wanted to go" because of his ailments. (*Id.*) Thomas tries to perform Jumu'ah in his cell on Fridays by holding services by himself but states "[y]ou can't have Jumu'ah with one person." (DSMF ECF p. 12). On January 26, 2015, at Thomas's request, all of his physical restrictions, including bottom bunk/bottom tier status, were removed. (DSMF ¶ 30).

C.    *Use of Bathroom During Religious Services*

Prior to 2013, the multi-faith chapel did not have a bathroom. (DSMF ¶ 31). On June 22, 2010, Superintendent Lawler submitted a request to the DOC Bureau of Administration for an upgrade of the multi-faith chapel facilities at SCI-Huntingdon to include bathrooms. (DSMF ¶ 32). The DOC Bureau of Administration did not approve the request at that time. (DSMF ¶ 33). Superintendent Lawler did not have the authority to install bathrooms in the chapel in the absence of approval and funding from the DOC Bureau of Administration. (DSMF ¶ 34). Due to budgetary constraints and competing priorities, construction of the bathroom in the multi-faith chapel could not take place until 2013. (DSMF ¶ 35). Two of the reasons for this decision were the fact that the multi-faith chapel is only utilized 29-30 hours per week, and that a specific faith group is in the multi-

faith chapel for a maximum of two hours per service. (DSMF ¶ 36). In 2012, the Pennsylvania Department of Labor and Industry approved the plans for the renovation of the multi-faith chapel at SCI-Huntingdon. (DSMF ¶ 37). In 2013 the funds were available for the construction of bathrooms in the multi-faith chapel. Construction was completed in April 2013. (DSMF ¶ 38).

Once a particular faith group is assembled in the multi-faith chapel for worship, the doors are locked until the service is completed. (DSMF ¶ 39). This practice is to maintain custody and control of the group of inmates for security purposes. (DSMF ¶ 40). Prior to the installation of a bathroom in the chapel, if an inmate was experiencing an emergency situation that necessitated the use of a bathroom during worship service, he had to leave the multi-faith chapel and was not permitted to return. (DSMF ¶ 41). The security reason for this was to maintain inmate accountability through dedicated line movements. (DSMF ¶ 42).

Jumu'ah is a congregational prayer service that Muslims hold every Friday. (DSMF ¶ 43). It is necessary to come to Jumu'ah in a clean state. (DSMF ¶ 45). A Muslim inmate who suffers from a disability for which he cannot confirm he is clean at Jumu'ah is not obliged to attend. (DSMF ¶ 46). He can practice his religion by praying peacefully in his cell. (DSMF ¶ 47).

Thomas claims that because there were no bathrooms in the multi-faith chapel, and inmates are not permitted to leave service to use the bathroom and return to the chapel, he was unable to cleanse himself properly for Jumu'ah between 2008 and

January 2013. (DSMF ¶ 44). Prior to the installation of the bathrooms in the chapel, Imam Bilgin Erdogan spoke to Thomas regarding his medical issues and proposed an alternative cleansing process he could follow that would allow him to attend Jumu'ah. (DSMF ¶ 48). That alternative is tayammum, the Islamic act of dry ablution using sand or dust, which may be performed in place of ritual washing (wudu or ghusl) if no clean water is readily available or if one is suffering from a moisture-induced skin inflammation or scaling. (DSMF ¶ 49). Tayammum may be substituted for wudu or ghusl when access to water is restricted or impractical, namely when a sufficient amount of water for ritual washing is not available, including when the availability of water for wudu or ghusl would leave insufficient water for drinking; when obtaining water is hazardous or prohibitively expensive; when using water poses a health risk; and when the available water is impure. (DSMF ¶ 50).

> D. *Presence of Religious Artifacts in the Multi-Faith Chapel at SCI-Huntingdon*

Muslims do not prostrate in front of images or artifacts. (DSMF ¶ 61). Muslims cover these images or artifacts, if it is possible. (DSMF ¶ 62). If it is not possible to cover images or artifacts, it is acceptable to pray in the presence of them. (DSMF ¶ 63). Imam Erdogan has been the Muslim Imam at SCI-Huntingdon since 2008. (DSMF ¶ 64). During that entire time, he has conducted Islamic services in the multi-faith chapel at SCI-Huntingdon. (DSMF ¶ 65).

At SCI-Huntingdon, faith-specific sacred symbols located in the chapel can be removed or covered when that particular faith group is not conducting its worship in order to respect the religious beliefs of all inmates utilizing the multi-faith chapel. (DSMF ¶ 54). Each specific faith group is responsible for ensuring that its specific sacred symbols are removed after the group has concluded its worship. (DSMF ¶ 55). These faith-specific sacred symbols are stored in locked cabinets when the particular faith group is not conducting worship. (DSMF ¶ 56). The only exception to this is a large cross that hangs from the ceiling in the multi-faith chapel. (DSMF ¶ 57). There is a curtain that can be pulled in front of the cross to obscure it from view. (DSMF ¶¶ 58-59). While Thomas claims there are additional faith-specific sacred symbols in the multi-faith chapel, he acknowledges that these symbols are covered with materials available in the chapel when Islamic services are taking place. (DSMF ¶ 60).

      E.     *Prayer by Muslims in SCI-Huntingdon's Multi-Faith Chapel*

Standing shoulder to shoulder during prayer is customary during Jumu'ah service. (DSMF ¶ 66). However, if there are obstacles that prevent attendants from doing so, it is not necessary to stand shoulder to shoulder during Jumu'ah. (DSMF ¶ 70).

The pews in SCI-Huntingdon's multi-faith chapel are bolted to the floor. (DSMF ¶ 67). Due to the layout of the pews in the chapel, it is only possible to have two or three lines of attendants standing shoulder to shoulder. (DSMF ¶ 68). The remaining attendants must stand in the pews and are unable to stand shoulder to shoulder. (DSMF

¶ 69).  The pews are bolted to the floor for security reasons.  (DSMF ¶ 71).  If the pews were not bolted to the floor, they could be placed on end and climbed, or could be used to build barricades, or broken apart to use as weapons.  (DSMF ¶ 72).

F.    *Inmate Organization Correspondence*

Approved inmate organizations may send and receive mail.  (DSMF ¶ 73). The staff coordinator for the inmate organization is the official liaison between the facility administration and the inmate organization.  (DSMF ¶ 74).  The staff coordinator is the designated DOC person for the particular inmate organization.  (DSMF ¶ 80).  He is responsible for the organization's activity.  (DSMF ¶81).  For this reason, the staff coordinator must be knowledgeable of all transactions that may affect himself, the inmate organization, and the DOC.  (DSMF ¶ 83).

Both incoming and outgoing inmate-organization mail must be reviewed and approved by the staff coordinator for the organization.  (DSMF ¶ 75).  All inmate-organization correspondence is reviewed by the President of the organization and then provided to the staff coordinator by the President.  (DSMF ¶ 77).  If the correspondence is approved by the staff coordinator, the staff coordinator seals and initials the envelope, and delivers it to the mailroom for mailing.  (DSMF ¶¶ 76 and 78).  This process of handling inmate organizational mail is necessary to ensure that an inmate is not abusing the organization's correspondence for personal business and there is no inappropriate content addressed to the person receiving the correspondence, such as improper fund raising activities.  (DSMF ¶ 79).

G.   *The Pennsylvania Lifers' Association (PLA) Chapter at SCI-Huntingdon*

The PLA has an approved chapter at SCI-Huntingdon.  (DSMF ¶ 84).  It is governed by an Executive Board that is elected by the entire membership of the PLA chapter.  (DSMF ¶ 85).  Defendant Frailey is the staff coordinator for the PLA chapter at SCI-Huntingdon.  (DSMF ¶ 87).  The Executive Board of the PLA holds periodic meetings.  (DSMF ¶ 88).  The Secretary of the PLA takes notes at these meetings that are later memorialized as minutes of the meetings.  (DSMF ¶ 89).  These minutes are not verbatim transcripts of what is said at the meeting, but rather a summary of topics and issues discussed.  (DSMF ¶ 90).

In 2010, Thomas was the Vice President of the PLA chapter at SCI-Huntingdon.  (DSMF ¶ 86).  On January 4, 2010, the SCI-Huntingdon's PLA Executive Board held a meeting at which the requirements of DC-ADM 803 application to inmate organization correspondence was reviewed and Executive Board members were advised that violation of this policy could result in their removal from the Executive Board. Defendant Frailey is the staff coordinator for the PLA chapter at SCI-Huntingdon.  (DSMF ¶ 91).  Thomas was present at this meeting.  (DSMF ¶ 92; *see also* Doc. 149-1, ECF p. 15, Minutes from Jan. 4, 2010, SCI-Huntingdon's PLA Exec. Bd. Mtg.)

H.    *Thomas's Letters to Mark Bergstrom*

On June 2, 2010, Thomas sent a letter to the Executive Director of the
Pennsylvania Commission on Sentencing, Mark Bergstrom.  (DSMF ¶ 93).  This letter
was not sent on PLA letterhead.  (DSMF ¶ 94).  The text of the letter is as follows:

> Dear Mr Bergstorm (sic)
>
> I am the Vice President of the lifers organization here at SCI-
> Huntingdon.  We would like to invite you to speak to the Lifers
> Board and the prison population about the Sentencing
> Commission agenda and any new needed legislation and
> guidelines.
>
> I understand your (sic) busy so please contact our
> Superintendent Lawler, for a scheduling date that agrees with
> you.  And thank you on behalf of the men and the State for your
> hard work.
>
> We would like you to arrive at 3:00 pm to meet with the PLA
> Board and then address the population between 6:00 and 8:00
> pm.
>
> Thank you very much for your professionalism in this matter.
>
> Sincerely
>
> Gregory Thomas

(DSMF ¶ 94; *see also* Doc. 149-1, ECF p. 16).  About a month later, on June 30, 2010,
Thomas wrote Bergstrom a second letter.  Again it was not mailed on PLA letterhead.
(DSMF ¶¶ 95-96).  The text of the letter is as follows:

> Dear Mr Bergstorm (sic)
>
> I am the Vice President of the PLA Prison Organization
> Pennsylvania Lifers Association.

We would like you to speak to our membership about the
sentencing issues now being considered. If you are willing,
please contact our Superintendent Lawler for permission. And
set a date on a Monday night so our membership meetings.
(sic)

Thank you very much for your professionalism in this matter.

Sincerely

Gregory Thomas

(DSMF ¶ 96; *see also* Doc. 149-1, ECF p. 17). Thomas did not discuss the specifics of

these letters with the PLA Executive Board, and did not provide the letters to the

President of the PLA before he mailed them out. (DSMF ¶ 97). Thomas contends these

letters were "personal mail" which does not have to be presented to the PLA before

mailing. (PSMF ¶ 97).

On August 24, 2010, Bergstrom sent Superintendent Lawler a letter

requesting to meet with "the PLA board and members," and enclosed copies of Thomas's

two letters. (DSMF ¶ 98; *see also* Doc. 149-1, ECF p. 18).

I.      *Thomas's Removal from the PLA Board*

In response to Thomas's decision to mail these letters to Bergstrom without

providing them to Defendant Frailey for review in advance of mailing, Frailey removed

Thomas from his position as Vice President of SCI-Huntingdon's PLA Executive Board

and restricted him from holding any Executive Board position in the future. (DSMF ¶ 99;

*see also* Doc. 149-1, ECF p. 21). Aside from the fact that Thomas was sending these

letters on behalf of the PLA, the content of the letters played no role in Frailey's decision.

-16-

(DSMF ¶ 101).  Frailey states that had Thomas provided these exact same letters to him for review in advance of mailing them, as required by DC-ADM 803, he would not have removed Thomas from his position as Vice President.  (DSMF ¶ 102).  Had Frailey been aware that Thomas sent out other letters on behalf of the PLA without providing them to him in advance of mailing, regardless of the content of the letters, Frailey would have taken the same action of removing Thomas from his position as Vice President of the PLA and restricting him from holding any Executive Board position in the future.  (DSMF ¶ 103; *see also* Doc. 149-1, ECF pp. 19-20).

J.   *The DOC's Inmate Grievance System*

The DOC has an established inmate grievance review system to provide prisoners in its custody with a procedure to resolve problems or other issues arising during the course of their confinement.  (DSMF ¶ 108).  Pursuant to DC-ADM 804, any inmate personally affected by a Departmental or institutional action or policy or by the action of a DOC employee may file a grievance after attempting to resolve the issue informally.  (DSMF ¶ 109).  If the inmate is dissatisfied with the initial response to a grievance, he may appeal that decision to the Facility Manager (superintendent).  (DSMF ¶110).  Any grievant who is not satisfied with the decision of the Facility Manager may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals (SOIGA). (DSMF ¶ 111).

K.    *Thomas's Grievance Regarding his Removal
from the PLA and the Involvement of
Defendants Keller and Lawler*

Thomas properly exhausted Grievance No. 334439 concerning his removal as Vice President of the PLA, including an appeal to SOIGA. (DSMF ¶¶ 105-107 and DSMF ECF p. 21, n. 18). Defendant Keller provided the initial review response to that grievance. (DSMF ¶ 106; *see also* Doc. 149-1, ECF p. 24). When Thomas appealed that response to the Superintendent, Superintendent Lawler provided a response. (DSMF ¶ 107; Doc. 149-1, ECF p. 25). Superintendent Lawler and Defendant Keller played no role in the decision to remove Thomas from his position as Vice President. (DSMF ¶ 104).

L.    *Thomas' Grievances Regarding the Multi-Faith
Chapel*

Thomas filed Grievance No. 333939 on September 7, 2010. This grievance requested that the pews in the multi-faith chapel be unbolted from the floor so the Muslim community could worship "sitting together like all the other faiths." (Doc. 179-17, ECF p. 19). This grievance was fully exhausted by Thomas appealing it to SOIGA. (DSMF ¶ 112).

On January 29, 2011, Thomas filed Grievance No. 352633. (Doc. 179-17, ECF pp. 20-21).[2] This grievance concerns Thomas' difficulties in accessing the multi-

_____

[2] The court notes that this grievance was filed *after* Thomas initiated his Complaint in November 2010. *See* Doc. 1, Compl. Dismissal of an inmate's claim is appropriate when the

(continued...)

-18-

fath chapel due to his physical limitations and the lack of restroom facilities in the chapel. (DSMF ECF pp. 20-21). Thomas properly exhausted this grievance through all levels of the DOC's grievance system. (DSMF ¶ 113).

Dorina Varner, the Chief Grievance Officer for SOIGA reviewed Thomas's grievance filings to determine which grievances he properly exhausted in accordance with DC-ADM 804 for the period of January 21, 2009, through July 23, 2013. (Doc. 179-17, ECF pp. 1-4). Thomas filed no appeal to SOIGA regarding the presence of religious items in the multi-faith chapel at SCI-Huntingdon. (DSMF ¶ 114).

V.     *Discussion*

Thomas claims that his First Amendment right to the free exercise of religion and his rights under RLUIPA are violated in the following ways: (1) he is required to worship in a multi-faith chapel that contains offensive religious iconography; (2) he is unable to pray shoulder to shoulder with other Muslims due to inadequate space in the chapel; (3) he is unable clean himself prior to religious services; and (4) he is often unable to attend services because the chapel is located up four flights of stairs that he is

---

[2](...continued)
prisoner has failed to exhaust his available administrative remedies before bringing a civil-rights action. *Oriakhi v. United States*, 165 F. App'x 991, 993 (3d Cir. 2006) (nonprecedential). The fact that Thomas may have fully exhausted this grievance after filing his second amended complaint would not alter this fact as the claim was plead in his original complaint. *See Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002) (holding that "[w]hatever the parameters of 'substantial compliance' referred to there, it does not encompass a second-step appeal five months late nor the filing of a suit before administrative exhaustion, however late, has been completed. It follows that Ahmed cannot cure the defect in his action by the proffered amendment of the complaint.") However, since Defendants did not raise this defense in their summary judgment motion, the court cannot, and will not, dismiss this claim based on Thomas's failure to exhaust this issue prior to bringing it before the court.

unable to climb due to his medical ailments.  He claims an ADA violation, also arising from the location of the chapel.  Finally, he claims Defendants retaliated against him by removing him from his position as Vice President of SCI-Huntingdon's PLA chapter and banning him from holding an executive position with the group after he sent two letters to Executive Director of the Pennsylvania Commission on Sentencing.

In their motion for summary judgment, Defendants contend that: (1) defendants Lawler and Keller are entitled to summary judgment on Thomas's RLUIPA claims; (2) Thomas has not established a violation of his First Amendment Free Exercise rights; (3) Thomas has failed to exhaust his claim regarding the presence of religious items in the multi-faith chapel during Islamic services; (4) Thomas has not established a First Amendment retaliation claim against Frailey; (5) Thomas has not established the personal involvement of Lawler and Keller in his retaliation claim; and (6) all defendants are entitled to qualified immunity.

A.    *Thomas's RLUIPA Claims*

Section 3 of the Religious Land Use and Institutionalized Persons Act (RLUIPA) provides, in pertinent part, that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1)-(2).

To prevail on a RLUIPA claim, an inmate must establish his religious belief was sincerely held, and that the defendants' actions created a "substantial burden" on the exercise of his religious beliefs. *Cutter v. Wilkinson*, 544 U.S. 709, 725, 125 S.Ct. 2113, 2124, 161 L.Ed.2d 1020 (2005). "Religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). A plaintiff has the burden of proving that his religious exercise has been burdened, and that the burden is substantial. *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007). The Third Circuit has held that:

> For the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Id.* at 280. A "substantial burden" includes a rule or regulation which compels the prisoner to engage in "conduct that seriously violates [his] religious beliefs." *Holt v. Hobbs*, ____ U.S. ____, ____, 135 S.Ct. 853, 862, 190 L.Ed.2d 747 (2015). "RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Id.* at ____, 135 S.Ct. at 862.

If a plaintiff proves that the government substantially burdened the exercise of a sincerely held religious belief, the burden then shifts to the government, and a court must determine whether the government has demonstrated that the burden was imposed both in furtherance of a compelling government interest and represents the least

restrictive means of furthering that compelling government interest. *Id.* at 282. In making

this determination, the court is mindful of the fact that "context matters,"[3] *Cutter*, 544 U.S.

at 723, 125 S.Ct. at 2123 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct.

2325, 2338, 156 L.Ed.2d 304 (2003)), and gives "'due deference to the experience and

expertise of prison and jail administrators in establishing necessary regulations and

procedures to maintain good order, security and discipline, consistent with considerations

of cost and limited resources.'" *Cutter*, 544 U.S. at 723, 125 S.Ct. at 2123 (quoting S.

Rep. No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900).

Where an inmate's request for religious accommodation would "become excessive,

impose unjustified burdens on other institutionalized persons, or jeopardize the effective

functioning of an institution, the facility would be free to resist the imposition." *Id.* at 726,

125 S.Ct. at 2125. Yet, "the mere assertion of security or health reasons is not, by itself,

enough for the Government to satisfy the compelling governmental interest requirement."

*Klem*, 497 F.3d at 283. Rather, the particular policy must further this interest. *Id.*

        Finally, RLUIPA does not authorize claims for monetary damages asserted

against defendants in either their individual or official capacities, but does allow for

injunctive relief against defendants acting in their official capacities. See *Banks v. Sec'y*

*Pa. Dep't of Corr.*, 601 F. App'x 101, 103 (3d Cir. 2015)(nonprecedential). Eleventh

Amendment immunity shields state actors acting in their official capacity from an award of

damages under RLUIPA. *See Sossamon v. Texas*, ____ U.S. ___, ____, 131 S.Ct. 1651,

---

[3] When "applying RLUIPA's statutory standard, courts should not blind themselves to the fact that the analysis is conducted in a prison setting." *Holt*, ____ U.S. at ____, 135 S.Ct. at 866.

1658-59, 179 L.Ed.2d 700 (2011).  Accordingly, only claims for prospective relief,

including declaratory relief and an injunction, are available to a successful RLUIPA

plaintiff.

In part, Thomas claims that his rights under RLUIPA are violated in the

following ways: (1) he is often unable to attend services because the chapel is located up

four flights of stairs that he is unable to climb due to his medical ailments; (2) he is unable

cleanse himself prior to religious services; and (3) he is unable to pray shoulder to

shoulder with other Muslims due to inadequate space in the chapel.[4]

Defendants do not dispute that Thomas possesses a sincerely held

religious belief.  Therefore, the question before the court is whether, in light of Thomas'

sincerely held religious belief, he has established a genuine issue of material fact as to

whether his religious exercise is substantially burdened by any of the three allegations

set forth above.  If the answer concerning any of them is "yes," the court must then

determine whether the government has demonstrated that the burden placed on

Thomas's religious exercise was imposed both in furtherance of a compelling

government interest and represents the least restrictive means of furthering that

compelling government interest.

---

[4] Thomas also claims he is required to worship in a multi-faith chapel that contains offensive religious iconography, but we will not address this claim because Thomas failed to exhaust his administrative remedies on it, as will be shown below.

1.     *Location of Jumu'ah Services on the Third Floor*

The first step the court must undertake in the RLUIPA analysis is whether Thomas has carried his burden of demonstrating that the practice of holding Jumu'ah services on the third floor of the institution, in the interfaith chapel, places a substantial burden on Thomas's religious exercise in attending Jumu'ah.  We do not find Thomas has carried this burden.

The location of the multi-faith chapel does not prevent Thomas from attending Jumu'ah; it is Thomas's physical condition that prevents him from attending the Jumu'ah service.  Moreover, the record shows that while Thomas "has not attended Jumu'ah on a regular and consistent basis, . . . he did attend on a regular basis for a period of time after the bathrooms were installed" in 2013. (Doc. 179-10, ECF p. 5). Thus, as Thomas suggests, he can attend Jumu'ah services in the chapel "on a good less pain free day." (sic) (Doc. 185, Opp'n Br. Mot. Summ. J, ECF p. 18).  Contrary to Thomas's suggestion, the defendants have not placed him in a "Hobson's choice" situation.  Rather, when he feels well enough to attend Jumu'ah services in the chapel, he is free to attend.  Defendants have not enacted a policy or practice that forces him to forfeit this right or place a substantial burden on it.

Further, as Defendants suggest, "[t]he removal of all of Mr. Thomas' physical restrictions in January 2015 have made his claim for declaratory and injunctive relief regarding the flights of steps that must be climbed to get to the multi-faith chapel moot."  (Doc. 180, Br. in Supp. Mot. Summ. J., ECF p. 32).  As noted above, monetary relief is not available to Thomas as to his claim against defendants in their official

capacities, *see Sossamon*, ____ U.S. at ____, 131 S.Ct. at 1654, or their individual capacities, *Sharp v. Johnson*, 669 F.3d 144, 154 - 55 (3d Cir. 2012).  It is undisputed that after January 2015 Thomas no longer held any medically necessitated restrictions on his physical activity.  As Thomas has not provided any medical evidence to suggest that he is unable to climb the four flights of steps to get to the third floor of the institution where weekly Jumu'ah services are held in the multi-faith chapel he has not demonstrated a need for injunctive or declaratory relief.

Assuming in *arguendo* that the location of SCI-Huntingdon's interfaith chapel placed a substantial burden on Thomas's exercise of his religion, the next step would be to determine whether the prison's practice (i.e. the designation of the multi-faith chapel for weekly Jumu'ah services) furthers a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.  As noted above, this inquiry must be made in the context of SCI-Huntingdon.  Defendants present evidence that there is no other suitable available space at SCI-Huntingdon that is large enough to accommodate the number of inmates who use the chapel.  Thomas counters this argument suggesting that the gymnasium could be used for religious services as is customary for holiday feasts.  (Doc. 185, Opp'n. Mot. for Summ. J., ECF p. 8).

Although not specifically raised by Defendants, it is a logical argument that taking over another popular area of an institution, such as the gymnasium, when the chapel is only used thirty hours per week, would present other problems for prison officials and inmates alike by displacing the recreation schedule by thirty hours a week.  Additionally, within the prison setting, transplanting indoor recreation, and its equipment,

to another location within the prison would be a daunting task. The cascading effect of swapping spaces is obvious. While the gymnasium can temporarily accommodate religious feasts twice a year, this does not suggest that the chapel cannot or does not provide adequate space for the number of attendees at each multi-faith session held in the chapel.

Moreover, Thomas does not suggest that the number of multi-faith groups that use the chapel during the week are individually large enough to make the gymnasium a more reasonable place of worship than the chapel. Courts must give due deference to the experience and expertise of prison administrators in balancing the day-to-day management of the care, custody and control of the inmate population in addition to providing meaningful religious, health, education, recreational and programming needs in a safe and secure environment on a limited budget and the existing physical plant of the facility. Defendants have argued that there is no other suitable available space at SCI-Huntingdon that is large enough to accommodate the number of inmates who use the chapel, and Thomas has not created a dispute as to this fact.

While recognizing that RLUIPA's protection extends beyond practices that are central to a religion, it is equally recognized that not every infringement on a religious exercise will constitute a substantial burden. Based on the record before the court, while we find that attendance at Jumu'ah is a tenet of Thomas's faith, we do not find that he has carried his burden to show that prison officials have placed a substantial burden on the practice of his religion by where Jumu'ah services are held. Accordingly, defendants Lawler and Keller are entitled to summary judgment on this claim.

2. *Availability of Bathrooms in SCI-Huntingdon's Interfaith Chapel and Thomas's Ability to Cleanse Himself*

Thomas has failed to show how the lack of access to bathroom facilities in the chapel between 2008 and 2013 for a cleansing ritual constitutes a substantial burden on his ability to practice his religion.

Thomas wears adult diapers at night and a catheter bag during the day. He claims Defendants' practice of not providing bathrooms where Jumu'ah services are held prevents him from practicing his religion, which requires that he cleanse himself before prayer. However, Imam Erdogan met with Thomas and offered Thomas an alternative method of ablution, tayammum, that could be performed without water. Thomas offers no evidence to suggest that the required religious cleansing must be performed with water. Thus, Thomas is able to cleanse himself in the chapel before prayer by completing tayammum should he elect to participate in Jumu'ah services. Again, Thomas has not carried his burden to demonstrate that a practice or policy of the defendants (i.e. not having bathrooms in the chapel between 2008 and 2013), has forced him to abandon a precept of his religion or placed substantial pressure on him to modify his behavior or violate his beliefs.

Further, Defendants argue that this RLUIPA claim is moot as SCI-Huntingdon installed bathrooms in the interfaith chapel in April 2013. As noted before, only injunctive and declaratory relief is available to Thomas on his RLUIPA claims. The existence of these bathrooms renders any claim for injunctive relief moot as Thomas now has access to facilities to cleanse himself.

3.  *The Inability to Pray Shoulder to Shoulder With Other Muslims Because of Inadequate Space in the Chapel*

Thomas claims that due to the presence of pews that are bolted to the floor, Muslim Jumu'ah congregants cannot pray properly "in straight lines all together." (Doc. 149, ECF p. 6). He argues Defendants' refusal to unfasten pews from the floor for the purpose of providing sufficient space for shoulder-to-shoulder worship substantially burdens his religious practice. For the purposes of this argument, the court will presume that not having sufficient space for all Jumu'ah attendees to perform Islamic prayer in a straight line is a substantial burden on Thomas's religious exercise. The court will instead deal with the burden placed on Defendants to demonstrate that the burden imposed furthers a compelling interest and represents the least restrictive means of furthering that compelling governmental interest.

Here, it is undisputed that there is sufficient room in the chapel for two or three lines of attendants to stand shoulder to shoulder during prayer. Defendants argue that affixing the pews to the floor in the chapel is necessitated by legitimate security concerns about their potential misuse. Thomas suggests that Defendants' security concerns are exaggerated as there are two security officers and security cameras inside the chapel during Jumu'ah services. *See* Doc. 185, ECF p. 9. While Thomas cites to defendant Keller's request-for-admission responses to support this statement, a review of the declaration does not support this finding. *See* Doc. 187-3, ECF pp. 59-50. Thomas does not cite to other portions of the record to support such a finding. Even so, such a

-28-

finding would not undercut Defendants' security concerns.  Being aware of a security

breach is not the same as preventing one, which Defendants argue is their motivation for

fastening the pews to the floor.

Likewise, Thomas's suggestion that some of the pews are already unbolted

from the floor is unsupported.  Moreover, this allegation, even if true, does not suggest

how Defendants' security concerns regarding additional free-standing pews in that

confined area does not remain an obvious and valid security concern in the context of a

prison setting.  *See* Doc. 185, ECF p. 9 and Doc. 187-3, ECF p. 55.  Defendants Lawler

and Keller are entitled to summary judgment on this RLUIPA claim.

B. *Thomas' RLUIPA and First Amendment Claims Related to the Presence of Religious Icons in the Multi-Faith Chapel Are Unexhausted*

Based on the summary judgment record, the court agrees that Thomas did

not file a grievance appeal to SOIGA that asserts a claim challenging the presence of

religious icons in the multi-faith chapel.  Thus, these claims will be dismissed for failure to

exhaust.

Alternatively, we note that Thomas does not dispute that religious items

used by the other religious groups that share the chapel are either removed or covered

when not in use by a particular faith group.  Imam Erdogan has held Islamic services in

the multi-faith chapel since 2008.  (Doc. 179-10, ECF p. 3).  He affirms that religious

images or artifacts are covered when possible during Muslim services.  (*Id.*)  He affirms

that "[i]f it is not possible to cover images or artifacts, it is acceptable to pray in the

presence of them." (*Id.*) He affirms that while there is a large cross in the front of the multi-faith chapel, in the direction Muslims face during prayer, a large curtain is drawn in front of the cross prior to prayer services so that the cross cannot be seen. (*Id.*)

Thomas confirms these statements. In his deposition, he spoke of climbing onto a high chair to cover offensive religious icons when attending Jumu'ah services in the chapel. (Doc. 179-4, ECF pp. 9 - 11). Other times he has used a bag or a piece of cloth found in the chapel to cover religious objects. (*Id.*)

Defendants argue they have a legitimate penological interest in accommodating different religions in the chapel and that the practice of removing those items which can be removed and stored out of sight, or covering them, is the least expensive way to provide a single faith-neutral space for each religious group. While Thomas would prefer an area free of any religious artifacts, the Imam conducts Jumu'ah services under these conditions. Moreover, Thomas has in the past participated in Jumu'ah services in the chapel under these conditions. Thomas has not demonstrated that the presence of religious artifacts belonging to other faiths that have been covered forced him to act contrary to his religious beliefs or precluded him from attending Jumu'ah services. The undisputed facts fail to demonstrate that any substantial burden is placed on Thomas's ability to exercise his religious beliefs, including participating in Jumu'ah services due to the presence of covered religious artifacts in the multi-faith chapel. *See Williams v. Sec'y Dept. of Corr.*, 541 F. App'x 236 (3d Cir. 2013) (nonprecedential).

C.      *First Amendment — Free Exercise of Religion*

The First Amendment offers protection for a wide variety of expressive activities. *See* U.S. Const. amend. I. These rights are lessened, but not extinguished, in the prison context where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *See Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

While inmates retain certain protections afforded by the First Amendment, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, and a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987)(quoted cases omitted). "To ensure that courts afford appropriate deference to prison officials . . . prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349, 107 S.Ct. at 2404. Under this standard, even when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner*, 482 U.S. 89, 107 S.Ct. at 2261. Further, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the appropriate means to accomplish them." *Id.* (citations omitted). Great deference must also be afforded to prison administrators "in the adoption and execution of policies and practices that are necessary to preserve internal order and to maintain institutional

security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

The plaintiff bears the burden of persuasion in a claim under the Free Exercise Clause of the First Amendment. *Overton v. Bazzetta*, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")(citations omitted). However, it is the prison officials' burden to demonstrate a rational connection between the regulation or decision at issue and a valid penological interest. *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009).

To establish a free exercise violation, at the threshold, an inmate must show that defendants burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith without any justification reasonably related to legitimate penological interests." *Turner*, 482 U.S. 89, 107 S.Ct. at 2261. Further, in determining whether a prison regulation, rule, or practice is "reasonably related" to legitimate penological interests, the following four-factor test is applied: (1) whether there is a "valid, rational connection between the prison regulation, rule or practice and the legitimate governmental interest put forward to justify it;" (2) whether there are "alternative means of exercising the right that remains open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the availability of "obvious, easy alternatives" that fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests. *Id.* at 89-91, 107 S.Ct. at 2262-63.

1.    *Location of Jumu'ah Services*

Under the Constitution, "reasonable opportunities must be afforded all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments." *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972). Accordingly, Thomas has the right to attend Jumu'ah services because he holds a sincere religious belief in the Islamic faith. Thomas argues that because the designated location for Jumu'ah services is on the third floor of the institution, defendants Lawler and Keller are excluding him from participating in Jumu'ah due to his medical issues.

First, the court notes that Thomas does not contend he has never attended Jumu'ah services at SCI-Huntingdon since 2008. Rather, he suggests he can only go on days he is feeling good, or in less than normal pain. Thus, by his own deposition testimony, it is questionable that any *policy* or *practice* restricts Thomas's attendance at Jumu'ah but rather his own physical limitations. In any event, we turn to the *Turner* factors. There is no question that the justification set forth by the prison for failing to relocate Jumu'ah services to a different location so as to accommodate Thomas's day-to-day pain limits is rationally related to the legitimate interest of running the prison safely and efficiently.

SCI-Huntingdon provides religious services for major faith groups such as Catholics, Jehovah's Witnesses, Jewish, Muslim, Native American and Protestants. The DOC allows for a diversity of worship and reasonable accommodations are made for

-33-

inmates consistent with the order, safety and security of the facility, prison staff and inmates. Pursuant to DC-ADM 810, general population inmates are permitted to attend communal religious services and programs which take place in the multi-faith chapel or elsewhere in the institution. Muslim inmates are offered a weekly Jumu'ah service, religious instruction and often basic Arabic. Inmates may pray and perform religious rituals and/or devotional practices individually in their cells as well as possess sacred texts and other religious literature. Additionally, inmates are permitted a Religious Advisor with whom they may meet for individual spiritual counseling in the institution's visiting room.

A prison's regulations that limit an inmate's ability to freely practice his religion are not necessarily impermissible: if an inmate's "request[ ] for religious accommodations becomes excessive, impose[s] unjustified burdens on other institutionalized persons, or jeopardize[s] the effective functioning of an institution, the prison [is] free to resist the imposition." *Cutter*, 544 U.S. at 726, 125 S.Ct. at 2125. Based on the physical plant at SCI-Huntingdon, as well as limited financial resources, Defendants state it would be impractical to move the multi-faith chapel to a different location as there is no other suitable available space large enough to accommodate the number of inmates who use the chapel. Moreover, the chapel is used approximately twenty-nine to thirty hours a week, with each specific faith group being allotted a maximum of two hours at a time. As there is no other available space large enough to accommodate the number of inmates who use the multi-faith chapel, a new building would have to be constructed for this purpose.

Thomas's suggested alternative of the gymnasium, as previously discussed, would displace thirty hours of programmed recreational time for the general inmate population and others who use that area. As a result, another location large enough and suitable for those types of activities would need to be built at SCI-Huntingdon. Again, the cost to provide an alternative space for the multi-faith chapel would be formidable. The decision to keep the multi-faith chapel in the same location where it has been since the construction of SCI-Huntingdon serves the compelling interest of cost containment in the face of all the religious, recreational and other obligations the DOC must meet.

2. *Availability of Bathrooms in SCI-Huntingdon's*
   *Interfaith Chapel*

Thomas argues the lack of a bathroom in the multi-faith chapel from 2008 to 2013 completely prevented him from attending Jumu'ah services in a purified or clean state due to his incontinence. Based on the record before the court, Thomas has not carried his burden on this claim. It is undisputed that Imam Erdogan discussed with Thomas an alternative to Wudu or Ghusul when water is inaccessible. The alternative dry ablution process, known as Tayammum, was available to Thomas prior to the construction of the bathrooms. Thomas has not presented any evidence to suggest that Tayammum is not an acceptable form of cleansing which would allow him to participate in Jumu'ah.

In any event, restroom facilities in the interfaith chapel could not be added before 2013, based on competitive institutional needs for limited resources and the

necessary construction approval process.  And because the accommodation of his request to move services to a location with a bathroom or to install bathrooms was cost-prohibitive, or had a tremendous impact on other inmates and staff alike, defendants are entitled to summary judgment on this First Amendment free exercise claim.

> 3. *The Inability to Pray Shoulder to Shoulder With Other Muslims Because of Inadequate Space in the Chapel*

Thomas argues that the prison's policy of only providing enough space in the interfaith chapel so two or three lines of attendants may stand shoulder to shoulder violates his First Amendment rights.  In applying the *Turner* factors, there is no question that the justifications set forth by the prison for refusing to unbolt pews from the floor are rationally related to the legitimate interest in running the prison safely and efficiently.  The security factor of providing material in a group setting for climbing, barricading, or striking others is obvious.  Moreover, having inmates sitting in pews that are not bolted to the floor poses an obvious safety hazard.

As to the second factor, Thomas could either participate in Jumu'ah by standing in the two to three rows that are able to stand shoulder to shoulder or assembling with the others who were not able to stand shoulder to shoulder.  Thomas does not suggest that he was unable to pray collectively at Jumu'ah services, rather that he could not perform his prayers as he wished.  As noted above, the potential impact on other prisoners, staff and prison resources in accommodating Thomas' request for either an alternative meeting space, or the unbolting of pews from the floor, is evident.  For

these reasons, the court finds that defendants are entitled to an entry of summary judgment on this claim.

      C.     *First Amendment - Retaliation for Contents of Outgoing Personal Mail*

      Thomas claims Defendants retaliated against him by removing him as the Vice President of SCI-Huntingdon's PLA chapter and banning him from holding an executive position with the group after he sent two personal letters to Executive Director of the Pennsylvania Commission on Sentencing. Defendants Lawler and Keller claim they are entitled to summary judgment on this claim as they were not personally involved in Frailey's decision to remove plaintiff from the PLA or his decision to bar him from holding another executive position with the PLA. Defendant Frailey argues he is entitled to summary judgment based on Thomas's failure to plead a viable retaliation claim.

      The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "An inmate retains his First Amendment rights that are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Sharp*, 660 F.3d 155 (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). The First Amendment rights of inmates, therefore, may be limited when they pose a "likelihood of disruption to prison order or stability." *Wilson v. Schillinger*, 761 F.2d 921, 925 (3d Cir. 1986) (citation omitted). "Free speech is not absolute at all times and under all circumstances." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

A prisoner alleging retaliation in violation of the Constitution must satisfy three elements: (1) that he engaged in a constitutionally protected activity, *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); (2) that he suffered some adverse action at the hands of prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (citing *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)); and (3) that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to" take the adverse action against him. *Rauser*, 241 F.3d at 333 (quoting *Mount Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

If a plaintiff establishes a prima facie case of retaliation, the burden then shifts to the prison officials to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if the plaintiff were not engaging in the constitutionally protected activities. *Rauser*, 241 F.3d at 334 ("Once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.").

When analyzing a retaliation claim pursuant to the above, it must be recognized that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned. *Id.* Because regulatory actions taken by prison officials are presumed to be reasonable, the inmate must come forward with more than "general attacks" on defendants' motivations

and must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury. . . ." *Crawford-El v. Britton*, 523 U.S. 574, 598, 600, 118 S.Ct. 1584, 1596-1597, 1598, 140 L.Ed.2d 759 (1998).

Thomas alleges he was engaged in protected conduct when he wrote what he characterizes as two personal letters to Bergstrom inviting him to come speak at the institution and to the PLA, and that Frailey impermissibly read his outgoing mail. (Doc. 185, ECF p. 30). Initially, the record does not support a finding that Frailey opened, read or censored Thomas's outgoing mail. To the contrary, the letters Thomas sent to Bergstrom were mailed by Bergstrom to Superintendent Lawler. Thus, there was no interference with Thomas's outgoing private mail. Clearly, Thomas's presumption that under prison rules "Frailey would have never known who Thomas [was] writing" is erroneous when Bergstrom sent copies of his letters back to the prison administration. (*Id.*)

In any event, given the content of Thomas's letters which violated the spirit of the institution's rules regarding inmate organization correspondence, he cannot sidestep this prohibition by claiming free speech. While it is undisputed that Thomas's letters were not sent on PLA letterhead, it is clear that the Thomas, who introduced himself as the Vice President of the PLA, was inviting Bergstrom to come speak to the "Lifers Board" and population and requested he contact Superintendent Lawler to arrange the details of his speaking engagement. These were not personal letters but invitations by an executive member of the PLA for the recipient to be a guest speaker to the institution. Truly indicative of this fact is the language Thomas used in the letters, "*[w]e*

would like you to arrive at 3:00 p.m. to meet with the PLA Board and then address the population between 6:00 and 8:00 p.m."   (Doc. 179-13; *see also* Doc. 179-14 ("*We* would like you to speak to *our* membership about sentencing issues . . . please contact *our* Superintendent Lawler for permission.  And set a date on a Monday night so *our* membership meetings [sic].")).

Even if the court were to consider Thomas's letters protected speech, such speech it is not protected if it is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system".  *Pell*, 417 U.S. at 822, 94 S.Ct. at 2804.  Thomas clearly overstepped his bounds as a general population inmate by inviting Bergstorm to the facility and to contact Superintendent Lawler to schedule the engagement in light of his knowledge of the institution's policy and process regarding inmate organization mail.  Thomas clearly violated institution policy designed to keep the president of the organization and staff coordinator advised of all organizational activity that may impact the institution or a third-party, clearly an important and legitimate penological objective in a correctional system.

We can certainly accept defendant Frailey's assertion that if Thomas had written to Bergstrom on behalf of the PLA, with the President's and Frailey's knowledge and consent, he would not have faced any negative repercussions from his activities. These, however, are not the facts of this case, as Thomas did not seek consent before mailing the letters.

The action challenged here does not restrict Thomas's right to communicate with those outside of the prison walls.  However, it does hold him

responsible for his actions which are contrary to prison policy. He is not subject to censorship, but rather is restricted from speaking on behalf of an inmate organization without following specific channels designed to keep the PLA and the prison aware of representations made in the PLA's name. Thomas's failure to follow the institution's policy in that regard was the motivating factor leading to his removal from his position on the PLA's Executive Board. Having demonstrated his inability to follow prison regulations with regard to inmate organization correspondence, when inmate outgoing correspondence is not generally monitored by prison officials, Thomas breached the level of trust the PLA and prison authorities invested in him as a member of the PLA Executive Board.

Given this scenario, his removal and Frailey's refusal to allow him to run for another PLA Executive Board position was not retaliatory, but a consequence and decision reasonably related to a legitimate penological interest. Because of Thomas's action in conveying a PLA invitation to Bergstrom without prior approval of the PLA President or Frailey, neither his letter nor his action of writing the letter, were the subject of retaliatory action. His retaliation claim therefore cannot survive Defendants' motion for summary judgment.

As Thomas has failed to demonstrate that Frailey retaliated against him for engaging in protected speech, there is no need for the court to examine defendants Lawler and Keller's argument that they lacked personal involvement in the retaliation claim based strictly on their after-the-fact review and response to Thomas's grievances. *See Mincy v. Chmielsewski*, 508 F. App'x 99, 104 (3d Cir. 2013)(nonprecedential)(citing

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988))(holding that grievances filed with the governor's office of administration were insufficient to establish the governor's actual knowledge of the conduct complained of).

All Defendants are entitled to summary judgment on Thomas's retaliation claim.

V.    *Conclusion*

In accordance with the foregoing, Defendants' motion for summary judgment will be granted, as no genuine issues of material fact exist on the claims that were the subject of the motion.  The sole remaining claim is Thomas's ADA claim against Defendants Lawler and Keller.  Defendants did not move for summary judgment on this claim, so it will proceed to trial.

An appropriate order follows.


/s/ William W. Caldwell
William W. Caldwell
United States District Judge


Date: September 22, 2015