IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY THOMAS,                    :
                                   :
        Plaintiff                  :
                                   :        CIVIL NO. 1:CV-10-2437
     vs.                           :
                                   :        (Judge Caldwell)
RAYMOND LAWLER,                    :
SUPERINTENDENT, *et al.*,          :
                                   :
        Defendants                 :


*M E M O R A N D U M*

I.   *Introduction*

        Plaintiff, Gregory Thomas', claim under Title II of the Americans With

Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, is the only claim left in this action.[1]  The

two remaining defendants, Superintendent Raymond Lawler and Program Director Keller,

are alleged to have denied Thomas an accessible location so he may participate in

Jumu'ah services at SCI-Huntingdon.

        Defendants filed a motion for summary judgment on the Title II ADA claim.

We will grant that motion on the claim as against them in their personal capacities.

Defendants did not address the claim as against them in their official capacities, nor did

they respond to Thomas' official-capacity arguments in their reply brief.  Nonetheless,

based on the evidence in the record, the court believes summary judgment on that claim is

_____

        [1] On September 22, 2015, we granted Defendants' motion for summary judgment on
Thomas' First Amendment free-exercise claims, his First Amendment retaliation claim, and his
claim under the Religious Land Use and Institutionalized Persons Act.  *See* Doc. 196.

proper as well.  However, before entering judgment on that claim we will allow Thomas the opportunity to present evidence showing that the claim should proceed to trial.[2]


II.     *Standard of Review*

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law."  *MacFarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 271 (3d Cir. 2012)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).  In reviewing a motion for summary judgment, the court must view all facts "in the light most favorable to the non-moving party" and "all reasonable inferences [should be drawn] in that party's favor."  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).  An issue is "genuine" if

---

[2] A district court may enter summary judgment *sua sponte* so long as the party against whom it is to be entered has notice and an opportunity to oppose.  *DL Resources, Inc. v. First Energy Solutions Corp.*, 506 F.3d 209, 223 (3d Cir. 2007).

supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Id.* at 248, 106 S.Ct. at 2510. A material fact is any fact that might affect the outcome of a suit under the governing substantive law. *Gonzalez v. Sec'y of Dept. of Homeland Sec.,* 678 F.3d 254, 261 (3d Cir. 2012).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004)(quoting *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2510).

III.   *Background*

The summary-judgment record is as follows.[3] The DOC is committed to providing inmates with the opportunity to practice the basic tenets of their faith through religious programs and services. (Doc. 202, Defendants' Statement of Material and Undisputed Facts (DSMF) ¶ 1). The DOC allows for diversity of worship and reasonable accommodations are made for inmates consistent with the order, safety and security of the correctional facility, prison staff and inmates. (DSMF ¶ 2). DOC institutions provide

---

[3]  Since plaintiff failed to file a paragraph-by-paragraph response to the statement of material facts which the Defendants filed in support of their summary judgment motion, their facts are deemed admitted. *See* M.D. Pa. Local Rule 56.1; *Carpenter v. Kloptoski*, No. 1:08-CV-2233, 2012 WL 911558, at *1 (M.D. Pa. Mar. 16, 2012) ("Because Plaintiff has failed to file a separate statement of material facts controverting the statement filed by Defendant, all material facts set forth in Defendant's statement [ ] will be deemed admitted.").

ecumenical services for major faith groups such as Catholics, Jehovah's Witnesses, Jewish adherents, Muslims, Native Americans and Protestants.  (DSMF ¶¶ 4-5).

The DOC policy for religious activities is set forth in Administrative Directive 819 (DC-ADM 819).  (DSMF ¶ 7).  General population inmates are permitted to attend communal religious services and programs which take place in the multi-faith chapels or elsewhere in the institutions.  (DSMF ¶ 8).  For Muslim inmates, weekly Jumu'ah service, Talim (religious instruction) and often basic Arabic classes are offered.  (DSMF ¶ 9).

Depending on an inmate's custody level and housing status, inmates are permitted to purchase and keep various sacred objects in their cells.  (DSMF ¶ 10).  Muslim inmates are permitted to keep a Allah pendant, a prayer rug, a set of Zihr beads, and two kuffis.  (DSMF ¶ 11).  These items are in addition to a sacred text, religious magazines, devotional guides and other religious book and pamphlets.  (DSMF ¶ 12).  Inmates are permitted to pray and perform religious rituals and/or devotional practices individually in their cells.  (DSMF ¶ 13).

Every inmate, regardless of their housing status, is permitted to designate a Religious Advisor.  (DSMF ¶ 14).  All inmates are permitted to correspond with their designated Religious Advisors as well as other religious leaders in the community.  (DSMF ¶ 15).  All inmates may receive visits from their designated Religious Advisor in accordance with DC-ADM 812, the DOC's visiting privilege policy.  These visits are generally no less than an hour, sacred texts are available during these visits, and arrangements can be made for available additional religious literature.  (DSMF ¶¶ 16-17).  Inmates may also

request one-on-one counseling with a chaplain of their choosing.  (DSMF ¶ 18).  All Muslim inmates are given the opportunity to participate in the Ramadan fast and two Eid ceremonial meals each year.  (DSMF ¶ 19 and ¶ 21).  Muslim inmates who feel a religious obligations to grow a beard longer than three inches may request a Grooming Length Exemption to do so.  Inmates who wish to maintain a Halal Diet may request a Non Animal Products Diet via the Religious Accommodation process.  (DSMF ¶ 24).

SCI-Huntingdon and its multi-faith chapel were constructed over 125 years ago.  (DSMF ¶ 25).  The chapel is centrally located on the third floor.  To access the chapel, inmates must climb four flights of stairs.  (DSMF ¶ 26).  Based on SCI-Huntingdon's physical plant and limited financial resources, it would be impractical to move the multi-faith chapel to a different location.  (DSMF ¶ 27).  There is no other available space at the institution large enough to accommodate the number of inmates who use the chapel. (DSMF ¶ 28).  The multi-faith chapel is utilized 29-30 hours a week, for a maximum of two hours per service by a specific faith group.  (DSMF ¶ 35).

Prior to 2013, due to budgetary constraints and competing priorities, there was no bathroom in the multi-faith chapel.  (DSMF ¶ 34).  Superintendent Lawler requested an upgrade to the multi-faith chapel facilities in 2010, including bathrooms. However, he did not have the authority to install bathrooms in the chapel without approval and funding from the DOC Bureau of Administration.  (DSMF ¶ 33).  In 2012, plans were submitted and approved by the Pennsylvania Department of Labor and Industry.  Funds for

the remodeling were approved in 2013 with construction being completed in April 2013. (DSMF ¶¶ 36-37).

Jumu'ah is a congregational pray service held by Muslims every Friday. (DSMF ¶ 42).  Because there was no bathroom in the multi-faith chapel, and inmates were not permitted to leave the area to use the bathroom and come back, Thomas claims he was unable to cleanse himself properly for Jumu'ah between 2008 and January 2013. (DSMF ¶ 43).  Although it is necessary for inmates to come to Jumu'ah in a clean state, the ritual cleansing may be accomplished without water.  (DSMF ¶¶ 44 and 48).  Tayammum, the Islamic act of dry ablution using sand or dust, may be performed in place of ritual washing (wudu or ghusl) if no clean water is readily available or if one is suffering from a moisture-induced skin inflammation or scaling.  (DSMF ¶ 48 and ¶¶ 49-51).  Moreover, Muslim inmates who suffer from a disability for which he cannot confirm he is clean at Jumu'ah is not obligated to attend.  (DSMF ¶ 45).  He can practice his religion by praying peacefully in his cell.  (DSMF ¶ 46).

On January 26, 2015, following Thomas' request, all of his physical restrictions, including bottom bunk/bottom tier status, were removed.  (DSMF ¶ 29).

IV.    *Discussion*

The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  It prohibits "discrimination against persons with disabilities in three major

areas of public life: employment, which is covered by Title I of the statute; public services,

programs, and activities, which are the subject of Title II; and public accommodations,

which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516-17, 124 S.Ct. 1978,

1984, 158 L.Ed.2d 820 (2004). *See* 42 U.S.C. §§ 12111 - 12117 (Title I); 42 U.S.C. §§

12131 - 12165 (Title II); 42 U.S.C. §§ 12181 - 12189 (Title III).

        Thomas' claim falls within Title II of the ADA as he alleges he is denied

access to religious programming, specifically participation in Jumu'ah services, at the

prison due to his mobility-related disability.  Title II prohibits a "qualified individual with a

disability" from being "excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity" because of the individual's disability.  42 U.S.C. § 12132.  Title II of the ADA

governs only the actions of public entities.  It is well-established that "[s]tate prisons fall

squarely" within the definition of "public entity" for purposes of Title II of the ADA.  *Pa. Dept.*

*of Corr. v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 1954, 141 L.Ed.2d 215 (1998),

*citing* 42 U.S.C. § 12131(1)(B).  Public officials, such as correctional employees, cannot be

held liable in their individual capacities for monetary damages under Title II of the ADA.

*See Matthews v. Pa. Dep't of Corr.,* 613 F. App'x 163, 169-170 (3d Cir. 2015)

(nonprecedential)("With respect to Corrections Officers Hunter and Arnone, we agree with

the Court of Appeals for the Second and Eighth Circuits that Title II of the ADA does not

provide for suits against state officers in their individual capacities."); *see also, Boggi v.*

*Medical Review and Accrediting Council*, 415 F. App'x 411, 414-15 (3d Cir.

2011)(nonprecedential)(no individual liability against "non-entity defendants sued in their individual capacities").  Thus, Defendants are entitled to summary judgment in their favor as to Thomas' individual capacity claims for monetary damages under Title II of the ADA.

Next, we must consider Thomas' claims against the prison defendants in their official capacities.  Unlike cases involving Title I of the ADA, the Supreme Court has held that the Eleventh Amendment does not bar actions against state entities for monetary damages brought under Title II of the ADA for conduct that violates the Fourteenth Amendment.[4]  *Compare Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) and *United States v. Georgia*, 546 U.S. 151, 154, 126 S.Ct. 877, 879, 163 L.Ed.2d 650 (2006).  Thus, Thomas' Title II claims against the Defendants in their official capacities are cognizable.

As noted above, in order to establish a prima facie violation under Title II of the ADA, Thomas must show that (1) he is a qualified individual with a disability; (2) the Defendants in their official capacities are subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from SCI-Huntingdon services, programs, or activities, or Defendants otherwise discriminated against him by reason of his disability. Based on the record before the court, it does not appear that Thomas is a qualified individual with a disability.

---

[4]  Claims for punitive damages may not be awarded in private suits brought under the ADA. *Barnes v. Gorman*, 536 U.S.181, 189, 122 S.Ct. 2097, 2103, 153 L.Ed.2d 230 (2002).

The ADA defines the term "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; [or] (B) a record of such an impairment; or, (C) being regarded as having such an impairment." *See* 42 U.S.C. § 12102(2). "However, '[i]t is insufficient for individuals attempting to prove disability status [under the ADA] . . . to merely submit evidence of a medical diagnosis of an impairment.'" *Pritchett v. Ellers*, 324 Fed. App'x 157, 159 (3d Cir. 2009) (nonprecedential)(citing *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002) (overruled on other grounds by the ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 353 (2008)). "Merely having an impairment does not make one disabled for the purpose of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota*, 534 U.S. at 195, 122 S.Ct. at 690. To prove disability, a plaintiff "must further show that the limitation on the major life activity is 'substantia[l].'" *Id.* "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Whether an impairment constitutes a substantial limitation is an "extraordinarily fact-intensive" inquiry that should be conducted on a case-by-case basis. *See Emory v. AstraZeneca Pharm. LP*, 401 F.3d 174, 182 (3d Cir. 2005); *see also Toyota*, 534 U.S. at 198, 122 S.Ct. at 692. In making such a determination, inquiries of particular importance are the nature and severity of the impairment, the duration or expected duration of the impairment, and its permanent or long-term impact. "Transitory,

temporary or impermanent impairments are not considered an impairment that substantially limits a major life activity." *Seibert v. Lutron Electronics*, 408 F. App'x 605, 607-08 (3d Cir. 2010)(nonprecedential).

Here, the issue is not whether Thomas was prevented from practicing his religion due to his difficulties in accessing the institution's chapel, as that question was answered in the negative in our September 22, 2015, memorandum and order. *See* Doc. 195 and 196.  The question presented at this time is whether Thomas is a qualified individual under the ADA and whether he is being discriminated against based on his disability with respect to access to religious programming, i.e., Friday Jumu'ah services offered at SCI-Huntingdon to all Muslim general-population inmates capable of walking four flights of steps to the multi-faith chapel.

The record does not show that Thomas is disabled under the ADA. Additionally, even if Thomas was able to demonstrate that he was disabled under the ADA, there is insufficient evidence in the record for a reasonable fact finder to conclude Thomas' lack of attendance at Friday Jumu'ah services is related to his disability or a result of discrimination.

First, we deal with the issue whether, drawing all inferences in Thomas' favor, a reasonable fact finder could conclude from the record that Thomas was disabled within the meaning of the ADA.  Thomas has not come forward with evidence to demonstrate that he is a qualified individual with a disability within the context of the ADA.  Thomas claims to suffer from lumbar spine degeneration.  His infirmities require him to wear a catheter and

-10-

Depends.  (Doc. 149, ECF p. 6; Doc. 187-3, ECF p. 77).  He fails to demonstrate that he is substantially limited in a major life activity.  Additionally, the only paragraph of Defendants' Statement of Material and Undisputed Facts (Doc. 202) that addresses Thomas' medical issues, states: "On January 26, 2015, at Mr. Thomas' request, all of his physical restrictions including bottom bunk/bottom tier status, were removed."  (*Id.* ¶ 29).  This statement is a double-edged sword.  On the one hand, it suggests that Thomas' treating physicians determined that he had a medical condition or impairment that would benefit from reduced climbing activities, thus suggesting Thomas may be perceived as having a mobility disability.[5]  On the other hand, the voluntary waiver of the lower bunk/lower tier housing order indicates Thomas does not need such an order, undermining his claim of having a disability that substantially limits a major life activity.

Other portions of the record also support such a conclusion.  Thomas has resided at SCI-Huntingdon since 2008.  (Doc. 149, Second Am. Compl.)  Thomas has been an active member of the institution's Pennsylvania Lifer's Association (PLA).  PLA Organizational meetings take place once a month.  (Doc. 187-3, ECF p. 17).  In 2010, the PLA Board meetings took place in the Activities Department of the facility.  (Doc. 187-1, ECF p. 35).  Thomas also held an inmate job within the prison.  *See* Doc. 149-1, ECF p. 3.

Additionally, there is evidence in the record that regardless of Thomas' medical ailments, he is capable of attending Jumu'ah services in the multi-faith chapel on a

---

[5]  It is undisputed that Thomas received his bottom bunk/bottom tier status from his treating physicians rather than as an "ADA accommodation" per DOC policy. *See* Doc. 187-1, ECF p. 5 and p. 20.

regular basis.  Imam Erdogan previously submitted a penalty-of-perjury declaration affirming that after the bathrooms were installed in the chapel (2013), Thomas attended Jumu'ah services "on a regular basis for a period of time."  (Doc. 179-10 at ¶ 22).  Thomas also participated in the set-up crew for the Eid feast activities which involved his carrying and laying rugs down in the gymnasium and serving meals.  (*Id.*, ¶¶ 23-24).  These statements are consistent with Thomas' admission that he can attend Jumu'ah services in the chapel "on a good less pain free day," (sic) (Doc. 185, Opp'n Br. Mot. Summ. J, ECF p. 18) or when his spinal issues do not "flare up."[6]  Thomas claims that because he is subject to "flair ups [which] will happen for the rest of his life, [ ] their (sic) called a disability."  (Doc. 187-1, ECF p. 21).  Again, the episodic nature of his inability to climb stairs when his back issues "flare up," do not support a finding of his substantial limitation in a major life activity.

Alternatively, assuming *arguendo* that Thomas did have a qualifying disability under Title II of the ADA, Thomas' deposition testimony and his past, albeit fluctuating attendance at Jumu'ah services, suggest that his present impediment to his Jumu'ah attendance is not disability-related.  Thomas admitted that even if physically able to attend Jumu'ah services, he would not do so because of religious idols from other faiths are in the chapel.  *See* Doc. 179-4, ECF p. 8.  Regardless of his medical condition, looking strictly at his "access" to a public benefit/program, i.e., Jumu'ah services, the record does not support Thomas' assertion that he has been denied access to such services because of

---

[6]  Thomas testified that he had a spinal injury and "sometimes it flares up, [he] cant make it" up the stairs to the multi-faith chapel.  (Doc. 179-4, ECF p. 5).

Defendants' discrimination based on his disability, as it appears to be his choice not to attend Jumu'ah services while under these conditions.

Examination of the record thus shows, even with reasonable inferences drawn in Thomas' favor, that he has not proven to be a qualified individual with a disability under Title II of the ADA or that he is denied the opportunity to participate in or benefit from congregate Muslim services by the Defendants by reason of his alleged disability.


V.    *Conclusion*

Defendants' motion for summary judgment will be granted as the Defendants cannot be held liable in their individual capacities for monetary damages under Title II of the ADA.  The court has also decided that summary judgment should be entered in Defendants' favor on the Title II claim against them in their official capacities.  However, before judgment is entered Thomas will be given the opportunity to oppose summary judgment on the latter claim.

We will issue an appropriate order.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge

Date: August 16, 2016

-13-